IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

360 MORTGAGE GROUP, LLC,
Plaintiff,

-vs-

HOMEBRIDGE FINANCIAL
SERVICES, INC. and JANINE
BIVONA-TRUMAN,
Defendants.

CAUSE NO.:
A-14-CA-00847-SS

**ORDER**

BE IT REMEMBERED on the 10th of February 2016, the Court held a hearing in the above-styled cause. The parties appeared by and through counsel. Before the Court are Defendants HomeBridge Financial Services, Inc. and Janine Bivona-Truman's No-Evidence Motion for Summary Judgment [#82] and Traditional Motion for Summary Judgment [#83], Plaintiff 360 Mortgage Group, LLC's Response [#100] thereto, and Defendants' Reply [#115] in support.[1] Having considered the documents, the case as a whole, the testimony at the hearing, and the governing law, the Court now enters the following opinion and orders.

**Background**

This case primarily involves a trade secret misappropriation claim. As a mortgage bank based in Austin, Texas, Plaintiff 360 Mortgage relies on regional account executives located across the country to contact mortgage brokers and encourage them to refer borrowers to Plaintiff. According to Plaintiff, all brokers are not created equal: "[b]rokers that are capable of

---

[1] Defendants also filed a Motion to Exclude Testimony of Plaintiff's Witnesses, to Exclude Plaintiff's Expert Report, and to Exclude Plaintiff's Evidence of Attorneys' Fees [#87], which Defendants orally withdrew at the hearing. Accordingly, Defendants' Motion to Exclude [#87] is DEEMED WITHDRAWN.

1

generating the type of business that will in turn generate high profit margins . . . are uncommon and hard to find." Resp. [#100] at 6.

Defendant Janine Bivona-Truman was an account executive located in Las Vegas, Nevada. As a new account executive, Truman was given a list of brokers who had preexisting relationships with Plaintiff, a list which Truman added to during her months at 360 Mortgage. This list (Broker List) contained the brokers' contact information and the contact information of their associated loan officers, as well as confidential compensation rates each broker agreed to take. Resp. [#100] at 16. Plaintiff insists the Broker List was highly confidential, precisely because brokers who are capable of generating high-profit business are rare and a competitor with access to this information "stands to make significant profits" within an accelerated time frame. *Id.* at 6.

The crux of Plaintiff's lawsuit is its claim for trade secret misappropriation: Plaintiff alleges Truman sent herself the Broker List before her email access at 360 Mortgage was terminated and either used or disclosed this list to Defendant HomeBridge Financial Services, Inc. in violation of the Texas Uniform Trade Secrets Act (TUTSA). *See* TEX. CIV. PRAC. & REM. CODE §§ 134A.001. Plaintiff also claims Truman breached her employment agreement by accepting employment at HomeBridge while continuing to work for Plaintiff.

Truman admits that she began working for HomeBridge on July 21, 2014 and was not terminated from 360 Mortgage until August 28, 2014, when Plaintiff was made aware of Truman's dual employment. HomeBridge claims it did not know Truman was still working for Plaintiff when she began her job at HomeBridge, but Truman testified her HomeBridge manager, Scott Brackett, was aware of her dual employment and even encouraged her to continue working

for Plaintiff to retain her health insurance. *See* Resp. [#100-4] Ex. B-C (Truman Dep.) at 156:25–157:4.

Plaintiff submitted evidence that during Truman's dual employment, Truman accessed the Broker List eight times and contacted by phone or email approximately forty loan officers and brokers found on the Broker List. *See* Resp. [#100-3] Ex. A-2 (Truman Access Log); *id.* Ex. 10 (Truman Contacts). On August 26, 2014, Brackett requested Truman to transmit her master marketing list to a HomeBridge marketing manager, which Truman did that same day. *See id.* Ex. A-11 (Brackett–Truman Emails) at 112. According to Plaintiff, 65% of the names on Truman's master marketing list came from the Broker List. Soon after Truman communicated this information to HomeBridge, HomeBridge sent a "master marketing blast" to the brokers whose names and contact information Truman provided. *Id.* Ex. A (Greco & Weissmalik Decl.) at 12; *id.* Ex. A-12 (Truman Marketing List). Plaintiff discovered Truman's dual employment after a broker—who received this marketing blast—contacted Plaintiff about Truman's employment status at HomeBridge.

After Truman's dual employment was discovered on August 28, 2014, Truman was notified her email access would soon be terminated. That night, Truman accessed Plaintiff's server and sent the Broker List to her personal email account. The next day, upon inspection of Truman's company email account, Plaintiff discovered Truman had deleted all of her sent emails from the preceding 4–5 month period, as well as certain emails in her inbox. Plaintiff was able to recover at least some of these emails.

Plaintiff argues the Broker List Truman obtained and conveyed to HomeBridge contains valuable information because it lists the vetted brokers and reflects confidential compensation rates each broker has agreed to take. According to Plaintiff, these rates are not public

information, are unique to Plaintiff's relationship with each broker, and a competitor may use this information to undercut Plaintiff's pricing. *See* Resp. [#100] at 16–17. When Truman accepted her employment at 360 Mortgage, she agreed not to use or disclose any confidential, proprietary, or trade secret information, including the Broker List. *See id.* [#100-3] Ex. A-3 (Truman Employment Agreement) at 49.

On October 10, 2014, this Court entered a preliminary injunction prohibiting Truman from doing business with any broker on the Broker List unless she or HomeBridge could demonstrate they had previously done business with that broker. Order of Oct. 10, 2014 [#29]. Fifteen brokers were released from the preliminary injunction after Truman submitted proof that she had previously worked with the brokers. *See id.*

Defendants filed two separate motions for summary judgment: a no-evidence motion for summary judgment[2] and a "traditional motion for summary judgment." *See* No-Evid. Mot. Summ. J. [#82]; Trad. Mot. Summ. J. [#83]. In the latter motion, Defendants allege (1) the Broker List is not a trade secret, (2) Truman did not acquire the list through improper means nor did HomeBridge encourage Truman to do so, and (3) even if the Broker List constitutes a trade secret, Truman neither used nor disclosed the Broker List to HomeBridge. On February 10, 2016, the Court held a hearing on Defendants' motion for summary judgment. The Court now addresses its merit.

---

[2] A no-evidence motion for summary judgment is only available in Texas state court. *See, e.g., Trautmann v. Cogema Mining, Inc.*, No. 5:04-cv-117, 2007 WL 1577652, at *2 (S.D. Tex. May 30, 2007) (concluding the defendants confused federal and state practice by arguing that the plaintiff bore the initial burden of demonstrating a genuine issue of material fact). Because Defendants simultaneously filed a motion for summary judgment seeking to show there is no evidence to support Plaintiff's claims, the Court declines to consider Defendants' procedurally-improper no-evidence motion and instead turns to the substance of their "traditional motion for summary judgment." *See* Trad. Mot. Summ. J. [#83].

4

## Analysis

### I. Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of*

*Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.   Application

Defendants first contend they are entitled to summary judgment on Plaintiff's trade secret misappropriation claim, arguing the Broker List does not constitute a trade secret, and even if it does, Truman did not misappropriate it. The Court disagrees, finding Plaintiff has presented sufficient evidence to raise a fact issue as to whether: the Broker List constitutes a trade secret; Truman acquired the list through improper means; and Truman disclosed or used the Broker List while working for HomeBridge. Defendants also seek summary judgment on Plaintiff's remaining claims, arguing these claims are preempted by TUTSA. The Court agrees in part and grants Defendants' summary judgment motion as to Plaintiff's claims for conversion, unjust enrichment, and constructive trust.

### A.   Misappropriation of Trade Secret

To establish a cause of action for trade secret misappropriation under Texas law, a plaintiff must prove (1) a trade secret existed, (2) the defendant acquired the trade secret through

6

improper means, and (3) the defendant disclosed or used the trade secret without the plaintiff's consent. *See Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015).

### i. Existence of Trade Secret

Defendants argue the Broker List is not a protected trade secret under Texas law, because (1) it provides no independent economic value, (2) it consists of publicly available information and therefore is readily ascertainable, and (3) it was not protected by reasonable efforts. TUTSA defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or *list of actual or potential customers or suppliers*, that:
>
> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6) (emphasis added). To determine whether a customer list like the Broker List is a trade secret, Texas courts look to (1) the steps, if any, an employer took to maintain the confidentiality of the customer list, (2) whether a departing employee acknowledges that the customer list is confidential, and (3) whether the content of the list is readily ascertainable. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003).

The first two factors are met in this case. First, Plaintiff's President Mark Greco and its Chief Operating Officer Andrew Weissmalik testified that to access the Broker List, an account executive would have to enter a secure password and even then she only had limited access to the brokers listed in her region. *See* Greco & Weissmalik Decl. at 8. Further, they testified that

7

"[i]t was regular practice at sales meeting[s] for [Plaintiff] to stress the confidentiality of the broker list," and indeed, the Broker List was clearly labeled "confidential information" on the company's database. *Id.*

Defendants counter Plaintiff's evidence by citing an Excel spreadsheet containing a list of brokers in Truman's region, which was sent to Truman by Jessica Hayes, an administrative assistant working for Plaintiff. *See* Trad. Mot. Summ. J. [#83] at 8. Greco was copied on this email. App'x Trad. Mot. Summ. J. [#84-4, sealed] Ex. G (Janet Scheurer Dep.) at 100:23–25. The spreadsheet was not labeled confidential and was not password protected. *Id.* at 104:22–105:2. From this email, Defendants concluded "[t]here were no measures taken to protect the Broker List." Trad. Mot. Summ. J. [#83] at 8.

However, simply reformatting the information and sending it to Truman and the company's President—who had unfettered access to the company's national database of brokers—without password protection does not negate the steps Plaintiff took to maintain the confidentiality of the Broker List for its regional account executives. Indeed, Janet Scheurer, a former administrative assistant, testified that when a managing supervisor would request she create an Excel spreadsheet containing portions of the national broker list, she did not feel the need to password protect the requested document before sending the document to her supervisor. Resp. [#100-4] Ex. B-D (Scheurer Dep.) at 146:20–147:8.

Second, Truman signed an employment agreement which expressly stated she understood the Broker List was confidential. Truman Employment Agreement at 49. Moreover, Truman's conduct in emailing herself a copy of the Broker List soon after learning her email access would be terminated suggests she believed the Broker List was not readily available elsewhere.

8

As to the third factor, Defendants argue the Broker List is not a trade secret because it is "readily ascertainable by proper means." *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(A). "A customer list of readily ascertainable names and addresses will not be protected as a trade secret." *Guy Carpenter*, 334 F.3d at 467.

However, as an initial matter, the Broker List provides more than simply the names and addresses of brokers whose names are listed on public websites. It includes information about the brokers' compensation rates, which, if obtained by a competing mortgage bank, could be used to undercut Plaintiff's pricing. Moreover, even if the Broker List is readily available, it may be protected as a trade secret given the difficulty and expense of compiling the information. *See Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir.1983). While a broker's name is publicly available through the National Mortgage Licensing System & Registry (NMLS), the Nevada Mortgage Lending Division website, and the public website for the Association of Mortgage Professionals, as Defendants contend, Plaintiff clearly undertook the expense of compiling a list of brokers it had researched, contacted, and vetted.

Similarly, readily available information "will be protected if the competitor obtained it working for the former employer." *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 626 (S.D. Tex. 2011); *see M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("Even if the customer information is readily accessible in the industry, these courts will uphold liability if the competitor actually gained the information in usable form while working for the former employer."). In this case, Plaintiff has presented evidence that Truman emailed herself the Broker List shortly after her termination and before her company email access was terminated. Plaintiff, then, has raised a fact issue as to whether the Broker List constitutes a protectable trade secret.

### ii.     Improper Means

Defendants allege Truman did not use improper means to obtain the Broker List nor did HomeBridge induce Truman to use improper means to acquire the Broker List. In order to establish a claim for trade secret misappropriation under TUTSA, the plaintiff must show a defendant acquired knowledge of the trade secret through "improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(2). "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, to limit use, or to prohibit discovery a trade secret, or espionage through electronic or other means." *Id.*

Truman owed Plaintiff a duty to maintain secrecy or at least prohibit the discovery of a trade secret even after her termination. *See, e.g.*, *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21–22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (stating a former employee has a duty not to use confidential, proprietary, or trade secret information acquired during the relationship "in a manner adverse to the employer"); *Auto Wax Co., Inc. v. Byrd*, 599 S.W.2d 110, 111 (Tex. App.—Dallas 1980, no writ) ("An employee during employment and after termination is under an obligation not to divulge trade secrets of his employer."); *Collins v. Ryon's Saddle & Ranch Supplies, Inc.*, 576 S.W.2d 914, 915 (Tex. App.—Fort Worth 1979, no writ) ("Even though no written contract is involved, an employee cannot use confidential information or trade secrets acquired while working for her former employer."). Plaintiff submitted evidence that Truman emailed the Broker List to her personal account soon after she was notified that her email access would be terminated. Because there is a fact issue as to whether Truman breached her duty to maintain secrecy by using or disclosing the Broker List, *see infra* section II.a.iii, the Court cannot conclude as a matter of law that Truman did not acquire the Broker List through improper means.

Moreover, "[t]he law imposes liability not only on those who wrongfully misappropriate trade secrets by breach of confidence but also, in certain situations, on others who might benefit from the breach." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1204 (5th Cir. 1986) As discussed below, *see infra* section II.a.iii, there is a fact issue as to whether HomeBridge made commercial use of the Broker List. As a result, the Court cannot conclude as a matter of law that HomeBridge did not acquire the Broker List though improper means.

### iii.   Disclosure or Use

According to Defendants, even if the Broker List constitutes a trade secret, Truman neither used the Broker List nor disclosed it to HomeBridge. Misappropriation requires actual use or disclosure of a trade secret without consent. *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(3). "Use" of a trade secret includes soliciting customers from which the defendant seeks to profit. *See Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 638 (N.D. Tex. 2015). Plaintiff insists that during her dual employment, Truman contacted approximately forty loan officers and brokers for the express purpose "of soliciting their business for herself at [HomeBridge]." Resp. [#100] at 13; *see* Truman Contacts. According to Plaintiff, Truman's repeated access of the Broker List during her dual employment establishes that Truman used the Broker List to derive an improper benefit for herself and HomeBridge.

Nevertheless, even if Truman did not actually use the Broker List, she may be liable for simply disclosing the trade secret without consent. *See Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 422 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("[A]ctual use or disclosure of the trade secret is a required element of the tort."). To support their claim that Truman did not disclose the Broker List, Defendants insist HomeBridge was not aware of Truman's dual employment or that she had emailed herself the Broker List until after this lawsuit

11

was filed. However, Truman admitted that Scott Brackett knew about her dual employment, and in fact encouraged her to continue working for Plaintiff to retain her insurance coverage. Truman Dep. at 156:25–157:4. Truman also testified she believed HomeBridge's human relations department was aware of her dual employment. *Id.* at 22.

Moreover, on August 26, 2014, Brackett instructed Truman to forward her "marketing database" to Darren Lawrence, HomeBridge's marketing manager. Brackett–Truman Emails at 112. Before Truman emailed her master marketing list to Lawrence later that day, Truman accessed Plaintiff's server and viewed the Broker List. Truman Access Log at 35. According to Plaintiff, 65% of the names on Truman's master marketing list came from the Broker List, which she had viewed hours earlier. Soon after Truman conveyed the Broker List to HomeBridge, HomeBridge sent out a "master marketing blast" to all the brokers whose names and contact information Truman had provided. Resp. [#100] at 14. Even if the marketing blast does not constitute "commercial use," as Defendants argue, there remains a fact issue as to whether the marketing database Truman forwarded HomeBridge constitutes disclosure. Given the present record before the Court, the Court cannot conclude as a matter of law that Defendants did not misappropriate the Broker List. Accordingly, Defendants' motion for summary judgment on Plaintiff's trade secret misappropriation claim is DENIED.[3]

---

[3] Defendants also argue they are entitled to summary judgment because Plaintiff cannot establish it suffered damages as a result of Truman's alleged misappropriation, since HomeBridge claims it did not have knowledge of the Broker List prior to this litigation and has not conducted business with a single prohibited broker on the Broker List since the preliminary injunction was entered. *See* Trad. Mot. Summ. J. [#83] at 16. However, under Texas law, damages are not a predicate to liability in a case involving trade secret misappropriation. *See BP, Inc. v. Klumpe*, 101 S.W.3d 461, 472 (Tex. App.—Amarillo 2001, no writ) ("Relief granted in an action by the owner of the trade secret may include damages, injunctive relief, or both."). Because Plaintiff seeks a permanent injunction in addition to damages, *see* Notice Removal [#1-2] Ex. 1 (Orig. Pet.) at 32, the Court declines to consider Defendants' damages argument.

**B.     Preemption**

In addition to Plaintiff's claim for trade secret misappropriation, Plaintiff asserts claims for breach of contract, tortious interference with contract, interference with prospective economic advantage, breach of fiduciary duty, conversion and theft, conspiracy, aiding and abetting, respondeat superior, unjust enrichment, and constructive trust.[4] *See* Orig. Pet. at 9–20. Defendants argue these claims are preempted by TUTSA, which specifically provides that it "displaces conflicting tort . . . law of this state providing civil remedies for misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007.

There is no Texas case interpreting the preemption provision of TUTSA, but courts in other states have interpreted a nearly identical provision of the Uniform Trade Secret Act (UTSA). *See, e.g., Coulter Corp. v. Leinert*, 869 F. Supp. 732 (E.D. Mo. 1994); *Smithfield Ham and Prods. Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995); *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988). These courts articulate the standard differently, but the thrust of their interpretation is this: A claim is not preempted if the plaintiff is able to show the claim is based on facts unrelated to the misappropriation of the trade secret. *See, e.g., Coulter Corp.*, 869 F. Supp. at 734 ("[T]he issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so the cause of action is barred."); *Smithfield*, 905 F. Supp. at 348 ("In order to survive summary judgment, therefore, a plaintiff must be able to show that the distinct theories of relief sought are supported by facts unrelated to the misappropriation of the trade secret."); *Micro Display Sys., Inc. v. Axtel, Inc.*,

---

[4] Plaintiff failed to respond to Defendants' motion for summary judgment on Plaintiff's claims for interference with prospective economic advantage, aiding and abetting, and respondeat superior. The failure of Plaintiff to offer any argument or evidence in opposition to Defendants' motion constitutes abandonment of these claims, and as a result, summary judgment is properly entered in Defendants' favor with respect to these three claims. *See, e.g., Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) ("Although [plaintiffs'] failure to respond [to the motion for summary judgment] does not permit entry of a 'default' summary judgment, the court is permitted to accept the movant's evidence as undisputed.").

699 F. Supp. at 205 (permitting "separate causes of action to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets"). As the *Smithfield* court noted, "[t]he plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." 905 F. Supp. at 348.

The Court agrees with these courts' interpretations, and as set forth below, finds Plaintiff's claims for conversion, unjust enrichment, and constructive trust are preempted by TUTSA. Plaintiff's remaining claims for breach of contract, tortious interference with contract, breach of fiduciary duty, and conspiracy survive Defendants' motion for summary judgment.

i. **Contractual Remedies**

TUTSA "does not affect . . . contractual remedies, whether or not based upon misappropriation of a trade secret." TEX. CIV. PRAC. & REM. CODE § 134A.007. Because Plaintiff's claims for both breach of contract and tortious interference with contract depend on the existence and content of a written agreement, these claims are not preempted by Plaintiff's claim for trade secret misappropriation under TUTSA.

ii. **Breach of Fiduciary Duty**

While Plaintiff's breach of fiduciary duty claim depends in part on Truman's alleged use of trade secret information, there are facts unrelated to Plaintiff's misappropriation claim which could support Plaintiff's breach of fiduciary claim. Under Texas law, while an employee may prepare to go into competition with his employer before resigning without breaching fiduciary duties owed to that employer, he "may not act for his future interest at the expense of his employer . . . by a course of conduct designed to hurt the employer." *Johnson v. Brewer &*

14

*Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002). In this case, there is evidence in the record that Truman did more than simply prepare to go into competition with Plaintiff. In fact, Truman continued to work for Plaintiff for over a month despite having accepted a job at HomeBridge in violation of her employment agreement; when initially confronted about her dual employment, Truman denied it; before she was terminated, Truman deleted potentially incriminating emails; and after this lawsuit was filed, Truman submitted a false declaration to this Court claiming she delivered Plaintiff a formal resignation letter. *See* Orig. Pet. ¶¶ 15, 21; Resp. [#100] at 15, 23–24; Truman Employment Agreement at 48. Because the claim is based on facts unrelated to those which form the basis of the trade secret misappropriation claim, Plaintiff's breach of fiduciary duty claim is not preempted.

### iii. Conspiracy

Plaintiff alleges Defendants conspired to misappropriate its trade secrets, which requires an agreement between two or more persons. *See Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). An agreement is not an element of a misappropriation claim under TUTSA. As a result, Plaintiff's assertion of misappropriation under TUTSA does not displace its claim for conspiracy. *See, e.g., Globeranger Corp. v. Software AG*, No. 3:11-CV-403-B, 2014 WL 4968053, at *4 (N.D. Tex. Oct. 6, 2014) (finding the plaintiff's conspiracy to misappropriate trade secrets survived the defendant's summary judgment motion).

### iv. Conversion

In this case, Plaintiff's claim for conversion is premised on the same facts as its claim for misappropriation of the Broker List. Most courts considering whether UTSA preempts a claim for conversion of trade secrets have concluded that it does. *See, e.g., New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 534 n.6 (S.D. Miss. 2013) (collecting cases which hold that UTSA

preempts a plaintiff's claim for conversion of confidential, proprietary, or trade secret information); *Nova Design Technologies, Ltd. v. Walters*, 875 F. Supp. 2d 458 (E.D. Pa. 2012) (holding the plaintiff's conversion claim based on trade secret misappropriation was preempted by UTSA); *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940–41 (S.D. Ohio 2012) (same); *B & F Sys., Inc. v. LeBlanc*, Civ. No. 7:07–CV–192 (HL), 2011 WL 4103576, at *27 (M.D. Ga. Sept. 14, 2011) (same). The Court agrees that a claim for conversion of trade secrets is preempted by TUTSA.

Moreover, to the extent Plaintiff claims Defendants converted confidential and propriety information in addition to trade secret information, the Court finds Plaintiff's conversion claim is still preempted. Most courts considering this question have determined UTSA was intended to preempt all claims based upon the unauthorized use of information. *See, e.g., Keener*, 989 F. Supp. 2d at 534 (collecting cases which hold UTSA preemption extends to claims for misappropriation of confidential and proprietary information); *AirDefense, Inc. v. AirTight Networks, Inc.*, No. C 05-04615-JF, 2006 WL 2092053, at *3 (N.D. Cal. July 26, 2006) (concluding the plaintiff's claim for conversion of confidential and proprietary information was preempted by UTSA because the claim was based on the same facts as those underlying the claim for misappropriation of trade secrets); *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) ("Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret."). Because Plaintiff's claim for conversion of "confidential or proprietary information" is based on the same facts as those underlying its claim for misappropriation of trade secrets, Plaintiff's conversion claim is wholly preempted.

v.      **Equitable Remedies**

Plaintiff brings claims for unjust enrichment and constructive trust, claiming Defendants unlawfully took Plaintiff's confidential and proprietary information and unjustly retained their benefits at Plaintiff's expense. *See* Orig. Pet. at 19. Because these claims arise from the same facts as those underlying its claim for misappropriation of trade secrets, they are preempted by TUTSA.

In sum, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims for conversion, unjust enrichment, and constructive trust, but DENIED as to Plaintiff's remaining claims.

## Conclusion

Accordingly,

IT IS ORDERED that Defendants HomeBridge Financial Services, Inc. and Janine Bivona-Truman's No-Evidence Motion for Summary Judgment [#82] is DENIED;

IT IS FURTHER ORDERED that Defendants HomeBridge Financial Services, Inc. and Janine Bivona-Truman's Traditional Motion for Summary Judgment [#83] is GRANTED in part and DENIED in part as set forth in this opinion; and

IT IS FINALLY ORDERED that Defendants HomeBridge Financial Services, Inc. and Janine Bivona-Truman's Motion to Exclude Testimony of Plaintiff's Witnesses, Plaintiff's Expert Report, and Plaintiff's Evidence of Attorneys' Fees [#87] is DEEMED WITHDRAWN.

SIGNED this the 29th day of February 2016.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE